IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHAREEF CHILDS,

                Plaintiff,

    v.                                              OPINION and ORDER

CHRISTOPHER BUESGEN, THOMAS ZEMAITIS,           24-cv-333-jdp
ZAYNE JOHNSON, and MICHAEL KASTEN,

                Defendants.[1]

---

       Plaintiff Shareef Childs, proceeding without counsel, is incarcerated at Stanley Correctional Institution. After a power outage forced staff to engage the prison's backup generators, Childs became ill from the generator's diesel fumes that were pulled into his unit's air intake, yet officers refused to get him medical attention. I granted Childs leave to proceed on Eighth Amendment conditions-of-confinement and medical care claims against several defendants. Several motions are before the court, including defendants' motions for summary judgment. For the reasons stated below, I will grant those motions and dismiss the case.

PRELIMINARY MATTER

       Childs has filed two motions for payment of expenses and for sanctions against defendants for forcing him to file a motion to compel the production of certain material and then failing to comply with the court's order on that motion. Dkt. 52 and Dkt. 61.

---

[1] I have amended the caption to include defendant Johnson's full name as reflected in his defendants' filings.

Childs moved to compel inmate complaints, prison emails, incident reports, maintenance records, and other information concerning the generator or reports of fumes from 2020 to 2025, the several-year period surrounding the March 16, 2023 incident in which Childs says that he was harmed by the fumes. Dkt. 25. Defendants had produced some documents relating to the generator but otherwise objected to Childs's requests as overly broad and unduly burdensome and that complaints filed by other inmates are confidential and would need to be redacted. I granted Childs's motion in part, stating that any material specifically relating to the March 16, 2023 incident, including other inmates' complaints, is "highly relevant" to his claims and that records tied to a specific date should be a relatively easy search. Dkt. 45, at 4. I stated that material from the several-year period surrounding the incident might also be relevant to explain defendants' awareness of the fume problem, although that created a larger burden for defendants to comb through their records. *Id.* I directed defendants to respond by explaining what material they would turn over to Childs and explaining in detail whether any particular type of document remained objectionable even given the possibility of redaction or implementation of a protective order. *Id.*

Defendants responded to my order, stating that they made additional searches of their documents using keywords like "fumes" or "diesel" and would send the documents directly about the March 16, 2023 incident to Childs. Dkt. 48, at 2–3. They continued to object to records from the several years before and after, stating that it wasn't relevant to Childs's claims and not proportional to the needs of the case; for instance, their keyword search uncovered almost 8,000 emails that would have to be reviewed. Id. at 3–4. They also objected on the grounds that they are entitled to qualified immunity on their claims. *Id.* at 4. But they said

that they would turn over all generator maintenance and repair records from the period. *Id.* at 5.

I directed Childs to reply. Dkt. 51. Childs replied with his two motions for sanctions, saying in the first motion that defendant had not yet sent him the material that I had compelled them to turn over, and saying in the second that they turned over "frivolous and irrelevant documents(s)" including multiple copies of the same documents. Dkt. 61, at 3. He seeks expenses of $1,000 and other appropriate sanctions for their noncompliance with my order.

Defendants respond to the motion for sanctions by saying that they complied with my order and sent him the material that I compelled them to, and that they should not be assessed costs because their original responses were reasonable given (1) plaintiff's vague and extremely broad requests; and (2) a "technical issue" with counsel's case management system that prevented counsel from receiving Childs's conferral letters before he filed his motion to compel. Dkt. 62.

Under Federal Rule of Civil Procedure Rule 37(a)(5)(A), the general rule is, "If the motion [to compel] is granted . . . the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion." There are exceptions if: (1) the movant failed to comply with Rule 37(a)(1); (2) the failure to provide discovery was "substantially justified"; or (3) an award of expenses would be otherwise "unjust." *Id.* Under Rule 37(b), I may also issue a wide array of sanctions if a party disobeys a discovery order.

To start with, I'll deny Childs's request for sanctions for violation of a court order. Defendants did not violate my order on Childs's motion to compel, so I will not sanction them

3

under Rule 37(b). Defendants did send Childs the material that he sought directly about the March 16, 2023 incident, and they otherwise responded to my request for more information about what documents from the 2020–2025 timeframe would be unduly burdensome for them to respond to. I reject defendants' arguments that the materials are unrelated to Childs's actual claims, but I am satisfied with their further explanation about the burden they'd face to sort through six years of emails; I conclude that they've turned over the appropriate materials. Childs now argues that defendants flooded him with irrelevant and duplicate records, but my review of the materials that he submitted is unconvincing. I will not sanction defendants for submitting multiple copies of an email sent to multiple prison officials.

As for Childs's request for expenses, defendants are correct that Childs's initial requests were quite broad, but that doesn't entirely let them off the hook. Particularly given that defendants faced an unrepresented litigant, I would have expected them to respond to Childs's request for a broad timeframe's worth of documents with at least the documents that I identified as "highly relevant": any material specifically relating to the March 16, 2023 incident. I also previously disagreed with defendants' objections to his request for production of documents aimed at discovering the identities of the John Doe defendants on the grounds that Childs could obtain this information himself, while also stating that the DOC does not have that information and that his request should have been made in an interrogatory rather than a request for production of documents. And a technical error on defendants' end doesn't absolve them of the duty to respond reasonably to discovery requests.

Accordingly, I will assess expenses against defendants. But those expenses will be limited to the cost of copies, mailing, and the like, so they will be minimal, not the $1,000 that Childs requests. I'll have him submit an itemized list of expenses. I also note that Childs's meritless

push for additional sanctions probably cost him as much as any expenses that he will receive; next time he shouldn't assume that unsatisfactory responses are the result of his opponent's bad faith.

I turn to defendants' motions for summary judgment on the merits: one filed by three of the defendants, Dkt. 36; and another filed by defendant Johnson after he was added to the caption, Dkt. 57.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Shareef Childs is a prisoner at Stanley Correctional Institution (SCI). Defendants all performed at least part of their DOC work duties at SCI. Christopher Buesgen is the warden, Thomas Zemaitis is the building and grounds superintendent, Michael Kasten is a captain, and Zayne Johnson is a correctional officer.

On March 16, 2023, at about 6:00 p.m., there was a power outage at SCI. Emergency backup generators started providing limited power to the institution. One of those generators is located outside of the building, next to Childs's unit, 4C. The ventilation provided to that unit comes from the HVAC system, which pulls air in from the outdoors through a fresh air intake, about 60 feet away from the generator's exhaust system. The prison is supposed to have full power when powered by its backup generators, but that has not always been the case, with systems like the door control system and intercoms not working when powered by the generators. During this outage, many systems stopped working, including the door controls, monitor cameras, and many of the phones and radios.

Inmates were escorted back to their cells for an emergency count. Defendants Kasten and Johnson were working on Childs's unit. Kasten told Johnson and the other correctional officers that they would need to perform additional security rounds while the power was out. After the inmates on the unit were back in their cell, and during the time the power was down, supervisors told Johnson that inmates were to remain in their cells. Inmates were only allowed out of their cells under staff escort.

Childs was asleep in his cell when the power went out. He woke up around 6:30 p.m. feeling sick to his stomach and having problems breathing, chest pains, and a severe headache. His cell had "a very strong gas smell and [his] cell was saturated with diesel gas fumes being pumped from the generator." Dkt. 75, ¶ 18. The fumes were coming from the vent. The windows in the cells on Childs's unit cannot be opened.

Childs tried to push the medical emergency button in his cell but it did not work. He beat on his cell door and yelled for help. Childs says that he spoke with defendant Johnson, who acknowledged the fumes and said that other inmates were complaining about them. Childs asked to go to the health services unit (HSU) to be seen for his symptoms. He says that Johnson told him that he wasn't letting anyone go to HSU.

Defendant Johnson says that he noticed only "a slight smell of diesel" in the unit dayroom. Dkt. 59, ¶ 88. Johnson doesn't remember speaking specifically to Childs, but he says that he told a handful of inmates who were asking to go to HSU that he would let them go as soon as possible but not during the power outage. Johnson said that he would have helped an inmate with a medical emergency get medical help, but he didn't think that any of the inmates who complained to him were experiencing an emergency. He says that no inmate complained of having breathing problems, chest pains, or a severe headache.

6

Childs says that about an hour later, his symptoms were worsening. He saw a supervisor on the unit so he beat on his door and yelled for help. The supervisor was defendant Kasten. According to Childs, he explained his symptoms to Kasten and his desire to go to HSU. Kasten acknowledged smelling the fumes and that other inmates were complaining about it. Childs asked Kasten why they couldn't be taken outside. Kasten responded that nobody could go to HSU or outside until the power was turned back on, and he walked away.

Kasten states that he could smell diesel fumes but it was not severe; he likened it to "the smell of diesel at a truck stop." Dkt. 38, ¶ 30. Kasten spoke to several inmates who complained about the diesel smell but none said that they were feeling sick. He doesn't remember speaking to Childs. He says that if an inmate had told him that he was experiencing breathing problems, chest pain, or a severe headache, he would have contacted HSU.

From 8:00 p.m. to about 11:00 p.m. inmates were escorted to pick up medication or have diabetic checks, one wing at a time.

Childs says that about an hour after his conversation with Kasten (which I take to make it about 8:00 p.m.), he began to feel even worse, "like [he] was going to pass out or die from breathing the diesel gas fumes." Dkt. 75, ¶ 26. Childs again beat on his door and asked for help. He says that defendant Johnson told him "if you don't stop beating on that door and yelling out of this cell I'ma send you to the hole." *Id.* Then, when Childs continued to explain to Johnson his trouble breathing and chest pains, Johnson told him, "Y'all got to wait and you ain't the only one complaining y'all need to man up." *Id.* Johnson denies saying that he would send Childs to the hole or that he needed to man up.

Another hour passed. Defendant Kasten came back on the unit. Childs yelled for help. When Kasten arrived, Childs told him that his symptoms were getting worse and he asked to

go to HSU. Kasten denied that request; Kasten again denies that any inmate told him that they were having symptoms like Childs describes. Childs states that he asked Kasten "why is this diesel gas being pumped into our cells like this?" *Id.*, ¶ 28. Kasten replied "they cut the air vents off," which Childs believes was a lie because the fumes were still "pumping" into his cell. *Id.* Childs told Kasten that the fumes were still coming into his cell and asked him why inmates couldn't be taken outside. Kasten responded that no inmates could go outside or to HSU until the power was turned back on.

At about 8:30 p.m. Kasten ordered the "smoke relief fans" turned on, fans commonly used to remove residual incapacitating agents when used. (Childs attempts to dispute that the fans were turned on by referring to the fifth page of a prison-log exhibit that has only four pages, Dkt. 73-2 at 40–43, so I will treat this fact as undisputed).

At about 9:00 p.m., defendant Zemaitis went to Unit 4C to meet with Kasten about reports of diesel smell on that unit. Zemaitis did not think the smell was overpowering. He believes that the problem was caused by wind blowing exhaust fumes into the unit's air intake. Zemaitis stated that he turned off the Unit 4 generator at 9:24 p.m. Childs disputes this; I take him to be saying that the generator couldn't have been turned off because the fumes continued to flow into his cell until about 11:00 p.m. or midnight. When backup generators are turned off, the only power remaining was from a battery powered lighting inverter to power the egress lighting. Around the time that Zemaitis says he turned off the generator, Kasten says that the diesel smell decreased.

Even after the power was turned back on at around 11:15 p.m., Childs was not taken to HSU, although Childs does not say that he asked for help after power resumed. Johnson left SCI at about 10:00 p.m. Kasten left when power resumed.

The day after the power outage, Childs says that he remained sick, was bedridden, and couldn't do any of his normal activities (although a log shows that he went to religious activities that afternoon). He continued to feel sick to his stomach and have problems breathing, chest pains, and headaches for days.

Two days after the power outage, he saw a nurse at HSU. His blood pressure was elevated but he was otherwise stable. She noted no indication of cardiac pain. She discussed potential causes of pain, and said that fluids and naps usually help. His COVID test was negative. She gave him ibuprofen. Childs says that the nurse told him that no staff from Unit 4C had called HSU about the diesel fume problem and that she couldn't do anything about guards refusing to get him medical attention.

Childs states that the diesel smell lingered for five to seven days after the incident.

I will discuss additional facts as they are relevant to the analysis.

ANALYSIS

Childs proceeds on two sets of claims: (1) Eighth Amendment conditions-of-confinement claims against all four of the defendants; and (2) Eighth Amendment medical care claims against defendants Kasten and Johnson for failing to get him medical attention for his symptoms.

## A.  Conditions of confinement

A prison official is liable for denying an inmate humane conditions of confinement if "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). For conditions to pose an excessive risk to inmate health or safety, they must be serious enough to "result[] in the denial of the minimal civilized

measure of life's necessities." *See Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). For a prison official to know of and disregard an excessive risk to inmate health or safety, he must know of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must actually draw that inference. *See Farmer*, 511 U.S. at 837.

Eighth Amendment case law makes clear that inmates are not entitled to completely pristine conditions of confinement. "Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms of cruel and unusual punishment . . . . But failing to provide a maximally safe environment, one completely free from pollution or safety hazards, is not." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). Nonetheless, prisoners are protected from noxious air. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 35 (1993) (noting that intense exposure to tobacco smoke could constitute a significant risk of harm to inmate health). Allegations of extremely poor ventilation systems have been held to satisfy the objective prong of an unconstitutional conditions claim where there is evidence of a "direct physical manifestation of the harm caused by the poor ventilation, as well as the quite likely possibility for future health problems." *See Board v. Farnham*, 394 F.3d 469, 486 (7th Cir. 2005).

Even assuming that the diesel fumes here were severe enough to be an Eighth Amendment violation, Childs's claims against defendants Warden Buesgen and Grounds Superintendent Zemaitis fail. These claims were based on his allegations that he wrote letters to both of them and got no response. Neither party submits a copy of those letters and defendants say that they never received them. Even inferring that Childs did send the letters and that defendants would have received letters addressed to them, it is clear that Childs wrote these letters the day after the incident, after the backup generator had been turned off and power restored. He states that he complained of lingering fumes, but that information alone

10

isn't enough for a reasonable jury to infer that Buesgen or Zemaitis were aware of a severe safety risk to Childs at that point.

Additionally, the Eighth Amendment doesn't require high-ranking officials to respond to every letter they receive about problems more appropriately handled by their subordinates. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Rather, inmates are supposed to use the inmate grievance system for complaints about prison conditions. Childs did file a grievance about the incident two days after the incident, *see* Dkt. 55-2, that was ultimately "affirmed" by Buesgen—the DOC's parlance for Childs winning the grievance—but in any event Buesgen's review of a grievance days after the danger had passed does not implicate him in the underlying alleged constitutional violation. *Cf. George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) (denial of an inmate's grievance regarding a completed act of misconduct "does not cause or contribute to the violation" of the inmate's rights).

Childs also suggests that Buesgen disregarded the risk of harm by failing to create an incident report afterwards and that Zemaitis disregarded the risk by failing to inform staff or inmates about the risk of harm from carbon monoxide or other noxious gases, and by failing to enter inmates' cells or conduct an air quality test. But I didn't allow Childs to proceed on claims about these alleged misdeeds so he cannot use them to stave off summary judgment for Buesgen and Zemaitis.

As for defendants Kasten and Johnson, Childs alleges that they were aware of the fume problem yet let Childs languish in his cell. The parties' versions of events are quite different. They disagree about the severity of the fumes and whether Childs complained to defendants about the symptoms that he was suffering. Even accepting Childs's version of the facts as true,

as I must do in considering defendants' motions for summary judgment, I must grant summary judgment to Kasten and Johnson under the doctrine of qualified immunity.

Under this doctrine, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The plaintiff can meet this burden by pointing to either: (1) a closely analogous, binding case that was decided in his favor; (2) a more general constitutional rule that applies "with obvious clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021).

Defendants contend that they are entitled to qualified immunity because there is no Supreme Court or Seventh Circuit precedent for conditions-of-confinement claims in the context of the type of problem they were forced to deal with: "a semi emergency power outage" requiring the use of backup generators to avoid "a state of chaos" at the prison. Dkt. 37, at 18. In response, Childs cites various binding and persuasive authorities for the proposition that prisoners are entitled to adequate ventilation. Dkt. 72, at 38–39 (citing, e.g., *Farnham*, 394 F.3d at 487 ("For almost two decades this court, as well as other circuit courts, have continually espoused a prisoner's right to adequate ventilation.")). But it is not enough for a plaintiff to

12

point to a general legal principle: he must show that the principle is clearly applicable under the specific factual circumstances at issue. *Mullenix v. Luna*, 577 U.S. 7 (2015). Childs doesn't cite any case, nor am I aware of any, presenting the type of factual dilemma faced by Kasten and Johnson here. The exposure to diesel fumes occurred in the context of a power outage at dusk (and running into the night), hampering the ability of security staff to move large numbers of prisoners, as evidenced by the three hours that it took officers to cycle wings of the unit through medication pass. Because Childs's right to relief under these circumstances was not clearly established under Eighth Amendment case law, I will grant defendants' motions for summary judgment on the conditions-of-confinement claims against defendants Kasten and Johnson.

## B.  Medical care

Childs also brings Eighth Amendment medical care claims against defendants Kasten and Johnson for failing to get him medical attention after he repeatedly complained about suffering symptoms from exposure to the diesel fumes. Defendants move for summary judgment both on the merits and on the ground that Childs failed to exhaust his administrative remedies on these claims. Because I conclude that Childs's claims fail on the merits, I need not address exhaustion.[2]

---

[2] Defendants also seek summary judgment on qualified immunity grounds, but Childs's medical care claims don't have the same qualified immunity problem as his conditions-of-confinement claims because defendants weren't faced with the same dilemma of how to resolve an entire unit being bombarded with fumes during a power outage. Rather, defendants agreed that despite the power outage they would have sent an individual prisoner to HSU if they thought that he had a medical emergency. That makes it a run-of-the-mill medical care claim, under which the merits of those claims and qualified immunity "effectively collapse into one," rendering a qualified immunity defense unavailable. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002).

The Eighth Amendment prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer*, 511 U.S. at 847. A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). Conscious disregard involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Childs alleges that Kasten and Johnson refused to send him to the Health Services Unit even though he had trouble breathing and he suffered nausea, chest pains, and a severe headache. Defendants argue that Childs didn't have a serious medical need because the nurse who saw him two days later didn't assess him with any serious problem, he didn't seek out medical attention the day after the incident, and he wasn't "bedridden" as he claimed given that logs show that he attended religious services the day after the incident. These arguments are not persuasive. Childs's condition one or two days later isn't the main issue here; it's whether he had a serious medical need at the time he asked for help and was refused by defendants. Evidence undercutting Childs's assertions of how badly he was harmed by the

14

fumes would be relevant at trial. But at summary judgment I must resolve all factual disputes in Childs's favor.

As for the question whether Childs had a serious medical need given his own description of the events, courts have repeatedly concluded that symptoms like Childs's are not severe enough to qualify as a serious medical need. *See, e.g.*, *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (exposure to second-hand smoke caused prisoner breathing problems, chest pains, dizziness, sinus problems, headaches, and loss of energy); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996) (mild asthma that caused shortness of breath, dizziness, and nausea was not a serious medical need); *Buchanan v. Pfister*, No. 17 CV 8075, 2018 WL 4699778, at *7 (N.D. Ill. Oct. 1, 2018) (no serious medical need where exposure to pepper spray caused nausea, blurred vision, vomiting, rashes, burning sensation, and numbness).

Aside from the outward physical manifestations of his illness, Childs says that he was poisoned by carbon monoxide, which if he could prove, would be a serious medical need on its own. But Childs doesn't have the medical training to make that assessment, nor is that a reasonable inference from the facts. And in any event, to violate the Eighth Amendment, defendants Kasten and Johnson would have to be aware of that medical problem and ignore it. Particularly given that Kasten and Johnson were breathing the same air as Childs, no reasonable jury could conclude that they thought that Childs might be poisoned but disregarded it. So I will grant summary judgment to defendants on these claims.

ORDER

IT IS ORDERED that:

1. Plaintiff's motions for expenses incurred in filing his motion to compel discovery at Dkt. 25, Dkt. 52 and Dkt. 61, are GRANTED. Plaintiff may have until April 1,

15

2026, to submit an itemized list of expenses. Defendants may have until April 15, 2026, to respond.

2.  Plaintiff's motions for sanctions, Dkt. 52 and Dkt. 61, are DENIED.

3.  Defendants' motions for summary judgment, Dkt. 36 and Dkt. 57, are GRANTED.

4.  The parties' exhaustion-related motions at Dkt. 53; Dkt. 56; Dkt. 65; Dkt. 78, are DENIED as moot.

5.  Defendants' motions to stay the schedule and to take depositions, Dkt. 86–88, are DENIED as moot.

6.  The clerk of court is directed to enter judgment accordingly and close the case.

Entered March 11, 2026.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge